Good morning, your honors. May it please the court, my name is Melanie Kay, and I represent the Wilderness Society at all, and I plan to split the time evenly with Mr. Bishop. Today I'll focus on two ways that BLM violated its legal obligations in managing the Upper Missouri River Breaks National Monument. The first relates to roads, and the second to the historic resources of the monument. Now the proclamation establishing the monument bans motorized vehicle use off of roads, but it doesn't define a road. It left that up to BLM. But in selecting its road definition, BLM doesn't have complete free reign. Under the APA, BLM needed to consider a reasonable definition in light of the meaning of the word at the time of the proclamation, as well as the relevant factors. And here, those factors are the proclamation's protective intent. Now nothing in the record demonstrates that BLM considered either of these factors. Instead, it shows that the agency prioritized an entirely different factor, and that was its desire to keep open as many of the primitive, user-created two-track routes as it possibly could, due to a promise it made early in the process at public meetings that it would do so. And this was no small consideration for the agency. BLM's own transportation manager said that this was what he considered, quote, the guts of the issue. And this created a problem for BLM, and that's because at the time of the proclamation, the agency's standard contemporaneous nationwide road definitions all required maintenance for continuous vehicle use in order for a route to be considered a road. And that definition would be too protective for what the agency felt it needed to do due to its political promise, and that was keep open these primitive, rutted two-track routes. So the agency had to work backwards, and it had to think about all of the routes that it wanted to keep open and find a definition that would let it do that. And as its own transportation manager described, an adequate definition of roads would be one that included any of the 525 miles of routes that have on some occasion been driven in the monument. And BLM found a definition that did just that. This definition is so broad that it allows one user to, at one point in time, drive off-road and create a rutted two-track route, and it might be so seldom used that it actually still has plants growing out of it. But that could be considered an official designated monument road. Now, the APA requires that BLM base its decisions on the relevant factors. And here, because BLM ignored those factors in favor of a political public relations problem, that decision violates the APA and is arbitrary and capricious. In terms of your argument, I'll go ahead, Judge Fischer. I just had a quick question. You said that a road could be created under this just by one usage. Is there any evidence in the record to support that? Or that's just your argument that that's all it would take, hypothetically? Hypothetically, Your Honor, that's all it would take, because the definition is broad enough that it says a road can be something that's just a rutted two-track that is still vegetated. And in this part of Montana, it's derogatory. Okay. You've answered the question. Thank you. The question I have is I think in general I understand your argument about the roads, but I'd like you to put it in the terms of the Supreme Court's State Farm precedent. That is, what is it that the agency is doing that's arbitrary and capricious? Are they not considering an important part of the problem, or is it something else? Yes, Your Honor. And the State Farm case says that the agency must consider the relevant factors, and it can't rely on factors that Congress, or in this case the President, did not intend it to consider. And here that's exactly what we see. We see ignoring the proclamation and its ban on off-road vehicle use, as well as its protective intent in favor of a political factor and a promise it had made at these meetings that it felt obligated to fulfill. Through the course of litigation, BLM's counsel now points to a whole collection of definitions that it claimed informed the one that it eventually chose. And we discussed those in our briefs and why none of them were reasonable for a monument, especially protected and set aside and not to be managed like the status quo. But the key with all of those definitions, to which BLM now points, is that the agency never demonstrates that during its decision-making it looked at those definitions and determined that those complied with the proclamation's requirements. Now, the second violation I'd like to address is – Is it still on the roads? No, I was going to switch, but if you have a road question. So what is your understanding that will happen to the ways under the plan? That is, are they going to be maintained? What happens to them now? Our claim didn't address vehicle ways. That's a claim that Mr. Bishop plans to address. But the way the plan is now, the vehicle ways are considered monument roads. And so that's going to allow public motorized vehicle use on these ways. It's sanctioned by the agency. And so BLM, from the plan, plans to treat those the same as roads. And I believe Mr. Bishop has further information about the distinction between the two. With respect to our National Historic Preservation Act claim, the NHPA requires that BLM undertake a reasonable and good-faith inventory of the monument. Now, when BLM did its planning in this case for the RMP, it didn't do any further on-the-ground inventories at all. And that's despite the fact that at the outset of its planning process, it possessed detailed on-the-ground inventory information about only 8% of the monument. And also, it was designating for the first time ever hundreds of miles of these user-created two-track routes. And these were routes that had never before been analyzed by the agency because they weren't planned by the agency. They weren't engineered by the agency. Some of the times, the agency didn't even know that they were there. So it wouldn't know if some of these routes, which were now designated and sanctioned for official vehicle use or public vehicle use, if they impact historic resources. And that's the problem that the NHPA seeks to avoid. And this is a rich area. This is a monument particularly known for its vast array of resources and specifically designated for those, to protect those. But instead of getting sorely needed on-the-ground inventory information, the BLM simply assumed there's not going to be any impacts, and they just hired some consultants to review existing literature. But the problem with that was that when the consultants went to review that literature, these are BLM's own experts. They came back to the agency and said to them, you need to do more on-the-ground work because the literature we looked at is outdated. It's based on inaccurate techniques, and it's obsolete. But BLM simply ignored that recommendation and called the job done. And that's not the reasonable— Did the consultant, counsel, did the consultant, Northwind, specify particular areas where the class three surveys would be recommended or did they just make a generalized statement? In other words, if we agreed with you, what would you be asking us to order with respect to class three surveys? Sure. Well, the consultants did specifically note that a particularly high— a rich area of artifacts was near the river and that some of those had been eroded since the time of the studies. So the consultants noted that that would be an area where new sites might be found. But in addition, BLM's own guidance provides instruction for the agency for where to inventory and where might be the most promising areas. And in this case, with the designation of roads, the guidance instructs that you can go to particular road corridors, do class two surveys to get a sense of where might be best to go in for the class three surveys, and then go do those later. So it's not asking the agency to go do all 375,000 acres of the monument. It's a reasonable way to start. And the NHPA's regulations also say that they can do it in phases. So it doesn't have to be a big, burdensome effort from the very beginning. And in terms of relief, how would that be implemented? Well, the agency— Would we tell a district court to enter an injunction or what? Well, here it would be a remand to the agency to go back and do further analysis. And during the time, since the RMP offers more protection than the status quo did, that RMP could be left in place during that time. But it would be instruction to the agency to go do the analysis that it didn't do the first time around. All right. Now, BLM's—one of the reasons BLM claims it didn't need to do on-the-ground inventory was that some of these roads were pre-existing. But that argument would have a lot more weight if these had been analyzed in the past. Again, these were roads created by users just haphazardly exploring the area. They weren't done by BLM doing—by engineering or by planning. So because they've never had any analysis, this is the time. And BLM's own RMP explains that the designation of a transportation network like this has site-specific impacts. If there are no further questions, I'll give the rest of the time to Mr. Bishop. Thank you very much. Thank you. I'm a police support. Matthew Bishop for Planned Parenthood's Montana Wilderness Association. As you know, the Missouri Breaks National Monument, commonly referred to as the Breaks, is a special place. And my clients, the Montana Wilderness Association, have been working to protect it for more than 30 years. They include hunters, recreationalists, boaters, birdwatchers, and hikers and history buffs who both live near and recreate in the monument. And I myself was fortunate enough to work for them as a volunteer back in the early 90s and got to know the area pretty well myself. It is truly a unique place. It's home to six wilderness study areas. I've designated Wild and Scenic River, cultural and historical properties, and as one historian said recently, it's probably the only stretch that Lewis and Clark would still recognize today on their journey. I'd like to spend my limited time this morning to address three issues that were discussed in the briefs. The first is Montana Wilderness Association's non-impairment claim under FLIPMA and the issue of ways now becoming roads in the monument's wilderness study areas. BLM had argued in the district court and on appeal, and the district court agreed, that a single piece of real estate in the WSA could be both a way and a road at the same time. A way for purposes of complying with FLIPMA's non-impairment mandate and a road for purposes of complying with the proclamation's prohibition on off-road travel. This is incorrect. I don't think the BLM should be allowed to have it both ways in this case. For over 30 years, since 1976, the agency has made the distinction between ways and roads. It all began with Congress's definition of the word roadless in a house report on FLIPMA's legislative history. It has been recognized by BLM in all of its guidance documents, including its wilderness inventory handbook and its interim management policy, the IMP, for WSAs throughout the last 30 years. The distinction was also recognized by the courts, including and discussed by this court in the Oregon Natural Desert Association case, 635 F3rd at 1107. Notably, the distinction was also applied and defended by BLM when designating the six wilderness study areas in the monument. It's a distinction that matters, and this is much more than a matter of semantics. Ways do not disqualify wilderness study areas for designation or eventual wilderness designation, and they are substantially unnoticeable on the landscape. We provided a picture of a way in the record, MWA's Supplemental ER-006, to provide an example of exactly what a way looks like. They are not improved or maintained, and they are typically left to revegetate naturally when not being used. A road, by contrast, disqualifies an area for both WSA designation, they're no longer roadless, and eventual wilderness designation. They are improved and maintained by definition, and they are mapped and typically officially open for motorized use. In this case, BLM violated Flint's non-apparent mandate by designating 24 miles of ways into roads. Now, BLM disagrees and has argued in its briefs that the ways will remain ways and that nothing really changed, that there will be no maintenance on these routes. But if you take a look at the EIS... That's the representation, that there will be no maintenance, right? That's what they argue in this case in their briefs, their counsel argues. But in the Record of Decision, Your Honor, it's spelled out clearly in the Record of Decision, where they say motorized travel in the monument is limited to designated roads. All roads are given one of three classifications, collector, local, or resource. And all roads are given, and must be given, one of five maintenance levels. And again, that's also spelled out in the Record of Decision. Here are the 24 miles of ways were classified as resource roads, that's spelled out, and assigned a maintenance level two, which now includes grading, erosion control, tree and brush removal. And if you're actually planning a trip to the monument right now, and you went to a local sporting goods store in Montana to buy a map, a travel map, for the first time you would see roads in wilderness study areas that weren't there before. So for the first time on their own travel maps... So the ways are designated as roads? The ways, primitive ways, are now designated as resource roads and subject to maintenance. And now depicted on the travel map of the monument. So the reason this is such a concern is because now all of a sudden these formerly roadless areas all of a sudden have roads in them, and the wilderness values, such as opportunities for solitude, apparent naturalness, which is why these areas were set aside, is now degraded, because you have roads in wilderness study areas. Importantly, there will also be increased and more concentrated motorized use on these new roads, which beyond conceived will result in additional impacts. Council? Yes, Your Honor. I had the question, you answered the question I was going to ask about mapping. In terms of the maps and access to these areas, are there any restrictions on the number of people who can come in? You say if you go to a sporting goods store you can buy the map, and you see a road, does that leave it within your hands as an individual, simply to then go drive there and figure you can drive on that road? Is it as simple as that? That's correct, Your Honor. The only areas that are really officially open for motorized use now are depicted on the new travel map for the monument. So if you want to go visit the monument, you would buy the map, it would show you where you could drive and where you couldn't drive, and now these areas would be depicted as open. And there is no limit on the number of people who can access the monument. The BLM specifically chose not to do that. So is your non-impairment claim, is it based on the proclamation or is it based on FLIPMA? Non-impairment claim is based on, I know it's complicated, there's actually two separate issues with respect to the roads. One is a FLIPMA non-impairment claim, that they violated FLIPMA's non-impairment obligation when they chose to designate ways in the roads. Is that grounded in the statute? That's grounded in the statute, Your Honor. That's an APA violation for violating FLIPMA. The second claim is we argue that they violated the proclamation's prohibition on off-road travel by authorizing motorized use on ways. They can't move the goal post. At the time in 2001, ways were never considered roads. They had never been considered roads. And it was pretty clear, we believe, that President Clinton and then-Secretary Babbitt did not mean to include ways as roads when they prohibited travel. When you say that's clear, is there anything in the record that would show that? The only information in the record as to what they meant, what President Clinton meant by off-road travel, is if you look at where that came from, the Central Montana Resource Advisory Council, which my clients were a part of, put together to provide recommendations to Secretary Babbitt. One of the issues that came up was a lot of the two-track and driving off roads. And they recommended to Secretary Babbitt that motorized use be limited to designated roads and trails. They used the word designated. It's hard to know exactly what they meant by that, but Secretary Babbitt's response, I think, is illustrative. He said he agreed, and that made sense, and that they would limit travel to designated roads and trails. The word designated didn't make it into the proclamation, but I think it does provide some insight into what they were thinking, and that ways which were not defined as roads, especially in the wilderness study, were not part of that, would not be included in that definition of a designated road or trail. Your time is running out. I just wanted to ask you about this off-road vehicle stuff, on the camping, the 50 camping, and what was the other one? Parking? Vehicle camping, yeah. BL justified it on the grounds of it wasn't called an administrative purpose. Yeah. Why can't they do that? Well, they certainly can. For administrative purposes, in fact, the dispersed camping rule of the 100-foot rule doesn't even apply for administrative uses. It's not relevant at all. We would certainly not object for safety concerns or for administrative purposes to allow people to pull off, turn around, and do that within the 50 feet of the road. But what we object to in this case, Your Honor, is a widespread authorization to do recreational car camping. Right. And that's specifically prohibited by the proclamation. It says you have to stay on designated. There's no driving off-road. In order to do that, it basically allows them to just pull off the road and drive and car camp. So they would actually have to drive off-road in order to do that. And that's what the concern is. It's just going to create too many impacts throughout the monument. There are some areas in designated campsites throughout the monument we don't think that people should be allowed just to drive wherever they want off a designated road and camp wherever they'd like. That's the concern. And their justification that it's for administrative purposes, just reading administrative purposes too broad. I think that's just their counsel's interpretation of the rod. It could be a good question for opposing counsel. In their briefs, they did concede that it was open for car camping. And I think the intent was to make it consistent with the authorization, the next door in the CMR Russell National Wildlife Refuge. Would you be concerned with that approach if roads were limited to the previously designated maintained roads and if roads didn't include the ways? I think the impact would be a lot less severe if you were limiting travel to actually maintained roads in the monument. But you're right because they designated over 400 miles of roads, 80% of which were these old two tracks. It creates a problem because all of a sudden there's dispersed camping all over the monument. If you want to hold your 40 seconds for rebuttal, you can do that. He's over. Thank you. May it please the Court. My name is Robert Stockman here on behalf of BLM. With me at counsel's table are Mr. Stephen Lechner, who's representing the counties, and Mr. Paul Turk, who's representing the aviation groups. I intend to speak for 14 minutes and to leave the remaining six minutes for Mr. Lechner and Mr. Turk. I'm eager to address any questions the Court has on any issue, but I'm hoping to touch on the following four issues in particular. One, BLM's ban on off-road travel. Two, the non-impairment of the wilderness study areas. Three, BLM's compliance with the National Historic Preservation Act. And four, BLM's hard look at the environmental consequences of the RMP. But before getting to those specific claims, I'd like to step back for just one second and point something out. This RMP makes a huge number of changes to current management. It closes and seasonally restricts hundreds of miles of roads, closes airstrips, forbids off-road travel, places restrictions on oil and gas development, places numerous restrictions on recreational use, all to protect the monument. And BLM, every time it had specific evidence, made adjustments to protect objects of the monument. They took an exhaustive look at the impacts, and they found that this level of usage will not impact the objects of the monument. And despite all their claims to the contrary, none of the plaintiffs can point to any evidence that suggests there will be harm to objects of the monument. So BLM met its protective mandate. Moving on, specifically the definition of roads. BLM cited in the EIS twice to its manual that's national, that's been in effect since 1985, that governs roads, which is accompanied by guidelines that describe how to inventory roads. And so it's not a post hoc analysis. And it's very explicit in the EIS. And the two places I would refer to the court are in the Wilderness Society excerpts, pages 174 to 176, and page 386. And what BLM said is we're not going to revisit our definition of roads because it's already addressed by BLM policy. And it cites to the BLM manual 9113. And this manual is crucial because it's accompanied by guidelines that say how to inventory roads. And it reflects that for several decades now BLM has had two different definitions of roads. And I know that's complex, but it's the way it is. One is in the limited place of the Wilderness Inventory Program. They have a definition of roads that distinguishes roads from ways. And then whenever it comes to planning a transportation plan, or setting out routes, or doing an off-road vehicle, they rely on their national guidance on roads. And that's 9113. And that is a broader definition of roads. And that's because it serves a very different set of purposes. It's about setting out how people can and cannot use the monument. And under that definition of roads, I quote, and this is at page 816, roads include resource roads, which include those roads or ways, whether the roadway consists of trackless only. And it goes on. So that supports the definition here, which is actually far narrower than that. And I take exception to the Wilderness Society's suggestion to the contrary. The definition used by BLM in the rod is, quote, clearly evident to track routes with regular travel and continuous passage of motorized vehicles over a period of years. And then later it says where wheel tracks are evident to the casual observer. These are not things that are created simply by one person going off-road. These have been used for years, in many instances decades. And it lines up with the national policy BLM uses when inventorying roads. And BLM expressly cited to that policy and explained that because it has a policy, I mean, it says current policy deals with that. But because it has a policy for defining what is a road for a transportation plan, it's not going to revisit it. Moreover, the Wilderness Society knew this during the record period because in their own comments, their own protests, and this is in the supplemental record at pages 23 and 24, they complained about the use of this definition. They said this definition of roads is not sufficient. Resource roads are not, shouldn't be counted as roads. So they were fully aware of this. It's not post hoc, and it's the way BLM goes about transportation planning. And it aligns with all of its other policies governing off-road vehicle use to the extent we can look to the creation of this monument and the rack, their representations. They said forbid OHV use, off-highway vehicle use. At that time, they were developing their off-highway vehicle policy, which also uses this same definition of roads. And it comports with also our plain meaning or our everyday understanding of what roads means. And here I would cite to that off-road vehicle policy and some of the images that accompany it, where there are pictures that clearly depict what we typically think of as off-road uses, having your roads off of a defined trail and on the grass, as opposed to traveling down a route where you're on previously pressed down, clearly evident routes. So the definition is grounded in a definition that was national, that was known at the time. It's consistent with many other definitions, and it's consistent with the purpose here. So there's every reason to think it's a faithful interpretation of what President Clinton meant when he created the monument. And to the extent this is complex and to the extent the word road is inherently ambiguous, the court should defer to the agency. This is akin to an executive order. The court has always recognized that when an agency interprets an executive order that it's been ordered to fulfill, it should be upheld unless it is clearly erroneous or inconsistent with the order. And here the term road is fundamentally ambiguous. I mean, the very evidence here shows that there have been multiple interpretations. And BLM chose one that it usually uses in this context. And now I'd like to turn to the part of the off-road definition that goes to the wilderness study areas, because I think it's helpful here to keep in mind that there are two claims with respect to the wilderness. Counsel, let me ask you one question. When you said a definition that BLM had used in this context, I understand they've used this definition. But was it used in the context of a proclamation that had a ban on traveling off roads? It's been used actually with respect to other proclamations, Your Honor. That's not in the record because this is about this proclamation and this RMP. But I know that for the Vermilion Cliffs, I think it is, or the Vermilion Monument, they're using an interpretation of primitive road, which lines up with this definition. And I believe that it's a fairly typical definition, though I did look into this, and I can't give you an answer that speaks to every proclamation. And I think it's particularly relevant because as we lay out in our brief, if you adopt a very narrow definition of road for many of these monuments, you will functionally shut off public access to a huge number of national monuments without any proof that it's necessary to protect the objects. And I think that's part of why this interpretation is so reasonable, because when there is proof that a road needs to be closed to protect the objects, there's an independent obligation on BLM to consider that and address it. So the question here is, would President Clinton have meant to shut off public access to vast portions of monuments with no proof? Do all the monuments have a ban on off-road travel? No, but many do. Many do. And the terminology is different. I mean, I don't want to make too much of this because I really do think each proclamation should be interpreted based on its own history. I would caution the Court if it were to rule broadly on this issue, it would have massive implications. But really, each one should be interpreted on the history of that proclamation, that monument. And I just note that the very resource management plans that govern these precise lands beforehand, they also use the definition of road that we're using here. So the local history supports it. The national policy supports it. The recent roads report supports it. I don't want to swamp the Court with too much, but there's a lot of support for this definition. And moving to the Wilderness Study Areas, I think that actually the Interim Management Policy supports this definition because only ways exist in Wilderness Study Areas for the purposes of the Wilderness Inventory Program. And the IMP, the Interim Management Policy, makes it clear that as a general matter, off-road travel in Wilderness Study Areas is forbidden. And yet, travel on vehicle ways is permitted. And what BLM was doing here was interpreting the term off-road. And so they said, well, what is off-road? Off-road does not include leaving a vehicle way. Because in Wilderness Study Areas, you're allowed to travel on vehicle ways, but you're not allowed off-road. So the off-road prohibition wouldn't have shut down your use of vehicle ways. So they decided that for these purposes, these would be roads. It would not be off-road to travel on these ways. But that's separate from the impairment inquiry. And the impairment inquiry is crucial here. In Montana Wilderness Association, the excerpts of record, their excerpts, at page 189 to 190, and then in the supplemental excerpts to that case at 477, BLM made it very clear that it would not impair the Wilderness Study Areas. And it made it clear, if you read it, that they'll only be maintained under the IMP. And it refers to these as vehicle ways. So it's clear that when you look at the specific parts of the RMP addressing Wilderness Study Areas, these are going to be managed as vehicle ways. And impairment is going to be avoided. So I can see what the- So what does it mean to manage them as vehicle ways? It means they won't be- It looks like they contemplate some level of maintenance. Not maintenance, not level 2 maintenance or anything like that, Your Honor, no. I'm not 100% sure of what will always pass the IMP, but it has to pass the IMP, and that's incredibly restrictive on what you can do on a vehicle way. And among other things, you can't create new surface- Why was it necessary for the BLM to designate these in their mapping as roads? The IMP actually says vehicle designations will occur through the transportation planning process. So, and that's the excerpts of record for that case at 422. It says the place to designate vehicle ways is in the transportation planning process. And they acknowledge the IMP governs. So they were following the law to designate these as vehicle ways. It looks like BLM is inviting the public to use these ways as roads. Well, it's invited- the public is allowed to use vehicle ways. That is- that's consistent with the non-impairment directive. And BLM is not shutting it down. I would note that these have been identified before in the wilderness inventory process, and they're supposed to be identified during the transportation planning process. And there's fewer vehicle ways now. They're closing off most of them. And then they're seasonally restricting many others. So actually, to identify them, they're able to say, you can't go on that one. That one's now closed. This one you can use. So it's actually protective in the end to be able to designate these things. It's not forbidden. The non-impairments- Is it likely to increase the amount of use? I think that BLM found that there would be an increase, not necessarily because of designations, but because other routes would be closed. Well, how about if you combine the two? I mean, designating them on the maps is accessible. I don't know- And you've shut down a number of others. I don't know that there's any evidence that designating them on the maps will make them more used, Your Honor. I mean, one thing to keep in mind is these have been identified before. And, in fact, there will be fewer vehicle ways open in the wilderness study areas, not only prior to the RMP, than were open when these were designated as wilderness. So, I mean, these are- this is not just non-impairment. This is actually increasing the wilderness values of these wilderness study areas. It is reducing public usage. So this is- and it's a necessary step. You have to be able to designate things to be able to close and identify what people can and cannot do. I think those were the major points I wanted to make about that, except for also to say most of these roads have been used for a long time. It's required they be used for years. Several have been used for decades. And the ways in the wilderness study areas have been there for a very long time. Many of them were identified when they did the wilderness inventory. And were they- Counsel? Go ahead, Judge Fischer. Can I- just to follow up on that, because we've had a- I had a case like this last year. When you, in effect, concentrate usage, as you may be doing here, or BLM may be doing here, is there a mechanism to review the impact of increased traffic? Is there something in the process so that as things play out on the ground over the next years, if there is, in fact, more usage that would degrade the area, is there a mechanism to address that? I don't know that there's a- I'm sorry to say I don't have the pin site for you, Your Honor, though I know it's in the brief. BLM made it clear that it would keep monitoring traffic and that if it was necessary to close further routes, it would do so. But I don't know that they have- it's not as though there are toll booths out there. So I mean- but they are keeping track of this, and they will close routes if it's necessary. And there's- I mean, one thing BLM said is there's just not evidence that the amount of public usage this area is getting is harming objects. And I think there it's helpful to keep in mind that actually there aren't a ton of visitors on this land. In the supplemental excerpts at page 309, there's only 7,000 people visiting the river every year. There's about 5,000 people visiting the uplands. So there is an evidence of a lot of harm. There's no evidence of harm to wildlife. There's no evidence that the airstrips harm wildlife. So BLM's making a reasonable determination. I'd like to quickly touch on parking. Parking, BLM's position is first, it's not off-road travel. That's not what that phrase means, to park on the side. Mr. Stockman, I'm going to remind you that you said you were going to leave six minutes for your guys. We'll give a little bit extra time so you're not in breach of covenant. I really appreciate that, Your Honor. I think that I'll try to wrap it up then so they can speak. We don't view it as off-road travel because parking is typically parking. It's different. Shutting off parking would once again shut off massive public usage, and we view it as an administrative purpose. And then finally, this was a reasonable National Historic Preservation Act review. This is a 370,000-acre area of land, and when you close routes and you don't introduce no surface disturbance, you don't have to do site-specific analysis, and that's very reasonable. I mean, they'd still be out there doing a site-specific analysis in terms of time and money, and there wouldn't be the protection there now is if BLM took forever. BLM would love to have all that information, but they have to make a reasonable decision about their resources. So if there are no further questions? Do you have anything further to say or anything to say about the National Historic Preservation Act claim that was addressed earlier? I think that so we think it's reasonable in good faith. It's consistent with the guidelines. I'd point out that one thing plaintiffs want here is more and more road closures, I think because they think that it will reduce harm. And then now that we've closed roads, that's allegedly a reason we have to do more studies to avoid harm. And there's kind of a this is you can't have it both ways, right? We view the road closures as incrementally just decreasing harm. We think that makes it worth doing, and a site-specific inventory every step of the way would be cost-prohibitive, and that's money not going to other historic preservation efforts. I mean, there's also the 110 process in which there's ongoing inventory. So it's not as though BLM's not doing inventory, and the SHPO loves BLM's program, and that citation's at page 408. They say you have an excellent exemplary cultural resources plan. And then the last thing I was going to say. So just to follow up on the NHPA, there's a reference by the consultant to doing a Class 3 survey, and you're suggesting that that's not necessary? So the consultant, and it's worth being very precise about this, they said it would be ideal to do they said that we should do a Class 3 survey, but they didn't say that they had to do one to do the RMP. And that's a crucial distinction. BLM had to make the decision, can we do the RMP without doing the Class 3 survey? And they concluded that, yes, that was consistent with the NHPA. That's not to say that it wouldn't be nice to do the Class 3 survey. BLM, if they had the resources, would love to do it. But they met their NHPA requirements by doing what they did, by doing a full inventory of all known information. No one has identified any other source of information they should have looked at. No one's identified a resource they failed to consider. So the consultant said do a Class 3, but they didn't say you have to do it to do this. They said you should do one anyway, which I think is an important distinction. And then just because it was brought up in the opening, we agree that the court should affirm. That's what we're asking for. But if there was going to be a remedy, the proper remedy would be remand without vacater, because this is much more protective than what was on the ground before. But, of course, we're asking this court to affirm, and thank you very much. Thank you, Mr. Stockman. Okay, Stacy, reset the clock so that we let the other appellees each have three minutes. May it please the court? My name is Steve Leckner, and I represent the Missouri River Stewards and the four counties that issue Blaine, Fergus, Chouteau, and Phillips County. As we heard earlier, the counties aren't happy about this plan either, specifically because of all the roads that close. And they're in this case because Montana Wilderness and the Wilderness Society wants this area to be managed as a wilderness, which it's not. Importantly, they call the roads being declared open, or they open roads. Really what happened is they closed 201 miles of road, about 33 percent of the existing mileage in the monument. They closed another 111 miles seasonally. That's 18 percent. So, in effect, here the BLM has closed over half of the roads in the monument. Appellants cannot really show that there is any injury to any of the objects because of these road closures. With respect to the wilderness studies areas, it's important to note that President Clinton didn't mention them when he designated the proclamation, so there's no evidence that he had the idea of roadless vis-a-vis wilderness study areas when he told them to do off-road road prohibition. They also closed, here the BLM also closed 53 percent of the ways in the wilderness studies areas, and they closed all the ways in three of the wilderness study areas. Of the remaining 23.8 miles, 14.6 of these are closed seasonally. That's 61 percent of all the open ways in the wilderness studies areas are closed, and so only 9.2 miles of roads are open year-round. These few remaining miles do not constitute impairment, do not violate the non-impairment standard. As to the definition of road, I submit that the Wilderness Society suggested that it was under Chevron Step 2 because President Clinton didn't define the word road, and the road is inherently ambiguous. I mean, it may even be super-deference, because what we have here is we have an executive agency interpreting an executive branch proclamation. Under Marbury v. Madison, Chief Justice Marshall said those things are almost not even reviewable, so it's a higher level of deference according to the BLM's definition of road. As respect to the National Historic Preservation Act, I submit that the appellants lack Article 3 standing and prudential standing to bring these claims. As we heard today, their interests are mostly recreational, hunting, and solitude. They have really no interest in the historical resources out there. They have not cited one case where a court found standing to challenge failure to consult with SHPO. I think that's very important, because they're trying to raise a claim that SHPO has to raise it. BLM owes SHPO the duty. If they didn't consult, SHPO should have raised it. It takes two for consultation. The BLM reached out to SHPO, invited them to participate, sent them everything. SHPO was nonresponsive. It was not the BLM's fault for that. Is the county's concern with the closure of the roads, is it just that it's going to reduce visitors? They have to get to their intermingled private lands. They're the ones that have been out there for 100 years, and all these roads are now closed. That's why they're in this case. It's not like they got everything they wanted. Also, because it's managed for multiple use, the counties sort of depend on the use of the federal lands and all the use of the federal lands for not only economic, but also their cultural survival. Thank you, Your Honors. Thank you, Counsel. May it please the Court. Your Honors, my name is Paul Turk. Judge Gould, you've been very gracious allowing me a couple minutes. I don't think I'm going to need them all. My clients in this case are narrowly focused on aviation and airstrip issues. Those issues have not been raised in the argument today. I think it's clear on the briefs that those are not the strongest arguments advanced by appellants, and as experienced counsel, they didn't feature them today. I want to wrap this up with one observation. There's a fundamental tension in the presentation of these cases. You heard Mr. Bishop talk earlier about how this is the only area on the traverse of Lewis and Clark that they would still recognize today. You heard Ms. Kay, when asked about it, say, acknowledge that the RMP is far more protective than the pre-decisional status quo, and that even if she wins, that she would agree to leave the RMP in place. This identifies the tension that I'm trying to get to, which is that they lobbied for designation of 375,000 acres as a monument, no small feat. They convinced Secretary Babbitt and President Clinton to imbue this area with monument status, and I will not deny it's deserving of that distinction. Then BLM came out and issued a plan that dramatically reduced the existing use, the use that had not created impacts that precluded the designation in the first place. So in the end, my point is that nothing is really broken here. BLM did its job. They split a Solomonic balance on what was already a pristine and a special area, and it's going to be even more protected going forward into the future, and I believe that this court should decline the invitation to interfere with the balance struck by BLM. That's all I have, Your Honor. Thank you. Thank you very much. Hearing no questions from my colleagues. I guess we're at about 40 seconds, so if you want to make a rebuttal, we'll give you a minute, but we've got to bring this to an end. Thank you, Your Honor. I'd just like to make a quick point in response to the argument that the definition BLM selected was in line with the H9113 definition. Now that definition came from BLM's Manual on Inventory, and that's meant to identify everything out there on the ground. And as that manual explains, it's supposed to be an inventory done to see all roads, regardless of their present use or condition, and it also differentiates between roads, but then it also says in parentheses, ways, implying that there's a distinction there. And BLM's own 9100 guidance does distinguish between roads and ways, and the roads require maintenance for continuous vehicle use. And that's the very definition that was presented to BLM's transportation manager by a BLM staffer, and the staffer recommended, you should use this definition. It's the one we use. It's our nation. It's in our handbook, and Mr. Whitehead rejected it for the political reasons I mentioned before. I'd also like to briefly address counsel's point saying that the definition selected was in line with the local ones that were in use at the time. However, this monument was established by the president, and the language used here banning roads is the identical language used in 11 other monuments across the country. So it's unreasonable to assume that a local definition for a management area with general status quo lands should be the one used for a monument specially protected for the resources of the monument. Okay. Thank you, counsel. I guess that's it. We will submit a Montana wilderness case. I want to thank, on behalf of my colleagues and myself, each of the lawyers here. You all presented very fine arguments. It's a very challenging case. So thank you very much. Thank you all.
judges: Fisher, Gould, Paez